E-FILED
Friday, 20 May, 2022  03:24:24 PM
Clerk, U.S. District Court, ILCD

with Jay Doherty." McClain said, "Mm hmm." Madigan said, "And um not necessarily with ComEd, but I had the thought that I could actually put Jay Doherty on a retainer." McClain said, "Mm hmm." Madigan said, "And then he'd have her and she'd do whatever she would do." McClain said, "Mm hmm." Madigan said, "We would tell her to, we'd tell ██████ prepare some monthly reports on what she's doing." McClain said, "Right, right." Madigan said, "So [unintelligible] got it on file." McClain said, "Right." Madigan said, "But if you could just give it some thought." McClain said, "Sure, may I call ██████?" Madigan said, "No harm, yeah, sure, you got his number?" McClain said, "Yup."

105. I believe that, in the preceding call, after being asked by ██████ ████████████████████████ to find employment for ████████████, Madigan contacted McClain. Madigan's statements during this call demonstrate that Madigan was aware that McClain had previously arranged for the payment of money by Exelon and/or ComEd to Madigan associates using JDDA as an intermediary. Madigan appears to suggest that he may elect to personally supply the payments to ████████ ████, but nonetheless expressed his desire to use JDDA as an intermediary to conceal the fact that he (Madigan) is the source of the payments. Madigan also demonstrated his awareness that the payments are not for commensurate work; rather, as Madigan suggests, ████████ would be directed to create "reports" on what ████████ was doing. I believe that, as used by Madigan, the term "reports" refers to documents that would

104

be generated for the primary purpose of making it appear as if the payments to ██████████ were compensation for actual work that she was performing for JDDA.

**C.   Madigan and McClain Solicit Illinois Lobbyists to Make Payments to** ██████████████████████████████

106.   In late August 2018, McClain initiated a series of calls to various lobbyists, including ████████████████████████████████ ██████ asking that they each make monthly payments to an individual named ██████ ████████████████████████████████████████████ ████████████████████████████████████████████[75]

During those calls, McClain contemplated the creation of a contract and some work product by ██████ primarily to defeat any tax investigation into why those lobbyists might deduct the payments to ██████ on tax returns as a business expense.

107.   In particular, on or about August 28, 2018, at approximately 9:03 a.m. (Session #12132), McClain placed an outgoing call from the McClain Phone to a telephone number used by ██████ McClain stated, "So, ██████████ called me." ██████ stated, "Yeah." McClain stated, "And uh, I met with him, and you know, he

---

[75] ████████████████████████████████████████████

105

asked, if I can help him trying to, try to find a job. And uh, I know, that the Speaker [Madigan] said, this is between you and me, to me that, after he gets sworn in as Speaker, and he's got the rules, he intends to help ████ " [McClain told ████ that, once Madigan was again appointed as Speaker of the House after the November 2018 election, he intended to take steps to assist ████ financially.] ████ stated, "Okay." McClain stated, "████████ tells me, that ████████████████ [unintelligible]." ████ asked, "Is what?" McClain stated, "Not damaging." [McClain advised that ████████████████████████████ ████ ] ████ responded, "Okay." McClain stated, "And so, and it's just not public yet. . . . So, I was thinking was to try to get a few of us all to kick in like a, grand [$1,000] or something, each month for 6 months, or until he gets a job, or if he gets a job earlier in that six months, then that would, that would terminate, but just to help get the guy by." ████ stated, "Do not hire him for anything, just –" McClain stated, "I think you can hire him as a consultant. Because I think at the end of the day, you're gonna write it off. And so, what I would say is, uh, I'd like to have a report from him at the end of the six months on, I'm just making this up, half a dozen House members, three or four senators, three County Board members and three or four aldermen." ████ stated, "Yes." McClain stated, "Because I'm going to ask ████ ████ and he doesn't do any lobbying at the state level." ████ stated, "Yeah." McClain continued, "And then, he has to give us a paragraph or two on each one, on, where they come from, maybe who their sugar daddy is, something that you can't

normally get." [McClain explained that, in order to make it appear that ████ was a legitimate consultant, he would prepare a short report.] ████ stated, "Yeah." McClain said, "So that uh, uh, if the IRS came in, said, you know, you deducted 6 grand, show me what you got for it?" [McClain explained that if the IRS attempted to verify that any tax deduction taken on account of payments to ████ was legitimate, ████ would be able to use the report to make it appear that ████ had done legitimate work in return for being paid $6,000.] ████ stated, "Uh huh." McClain stated, "You'll actually have, you'll have a contract, but you'll also have a piece of paper." ████ stated, "Okay." McClain asked, "You wanna think about it?" ████ responded, "No, I'm, I'm, yeah, that's that's fine. Uh, whatever you suggest. Who else is gonna do it, Mike? Besides me?" McClain stated, "I'm gonna ask ████, I'm gonna ask you and me, uh, depends on how much ████ is willing to kick in, right? So uh, and then, uh, I'm gonna ask ████, and then, ████" ████ stated, "Okay." McClain stated "So, so, if uh, if uh, ████ is willing to kick in a grand or 2,500, and we all kick in a grand, that'll get the guy right around $6,000. Which doesn't replace what he was making, but it comes pretty close, and I don't wanna make the uh, the circle very wide." ████ stated, "Right." Later in the conversation, McClain stated, "Good, I just wanna keep it real small. I gotta call into ████, he tells me what he's willing to kick in, and uh, I'll call ████ and then ████, then I'll prepare a model contract for everybody. Uh –" [McClain explained he would create the contract that would make it appear that ████ was

107

providing consulting services.] ███████ stated, "I don't even care, I mean, for $6,000,
I don't even know if it's worth the risk of trying to, of trying to write it off." McClain
stated, "Well, as long as I give you a contract and we get a piece of paper from ██████
at the end, uh, I think it's legitimate. But that's up to you, that's up to you." ████████
stated, "I, would it be even more protection for him if I, like, since I still ██████████████
████ if I hired him as an investigator or something? So where it's not even anything
to do with politics or, completely —" McClain asked, "So you would you still want this
same memo or not?" ███████ stated, "Well, I'm just, I'm just brainstorming, right."
McClain stated, "Yeah." ██████ stated, "So I'm trying to think of giving him as much
protection as possible."  McClain stated, "Yep. Why don't you think about how you
want it to be . . . and, then uh, I'll tailor the contract to that." ███████ stated, "Yeah,
no problem." McClain stated, "Probably, probably would need to know, like what
entity you want, right?" ███████ stated, "Yeah . . . Okay, not a problem. Not a
problem. Thanks for asking." McClain stated, "Yeah, so at the end of the day, I want
you on the list, right?" ███████ responded, "Always." [McClain told ███████ that he
wanted ███████ to be recognized ("on the list") as one of the individuals assisting
██████, which would be meaningful to Madigan.] Later in the conversation, McClain
stated, "Or the other way is, I wanna be in the pre-meeting. [Laughs.] ███████
laughed. McClain stated, "There's another way of putting it right? I don't wanna be
in the meeting, I wanna be in the pre-meeting." ███████ stated, "Exactly, okay, yeah,
just let me know, just let me know when you wanna start, and I'll noodle that a little

bit, but whatever you say." McClain stated, "So it starts September, and six months later." ▓▓▓▓ stated, "How many--" McClain interjected, "I guess uh, sorry—" ▓▓▓▓ stated, "I'm sorry, how many consultants did you have before you retired?" McClain responded, "Oh shit. [Laughs] Oh shit, or how many consultants does uh, did ComEd have?" ▓▓▓▓ responded, "Oh yeah." McClain stated, "Or how many consultants does uh, Jay Doherty have, or how many- you, you would just be amazed." [I believe that McClain was explaining to ▓▓▓▓ that others—including ComEd and Jay Doherty's lobbying firm—frequently paid Madigan associates, and made such payments appear to be legitimate business expenses by making it seem that Madigan's associates had been hired as consultants.] ▓▓▓▓ stated, "Well, I'm working on three now. I've got a little practice. [Laughs]."[76]

108.  On or about August 28, 2018, at approximately 9:43 a.m. (Session #12136), McClain received an incoming call on the McClain Phone from a telephone number used ▓▓▓▓▓▓▓▓▓[77] During the call, McClain and ▓▓▓▓ discussed

---

[76] At the time of this call, as discussed above, ▓▓▓▓ was serving as an intermediary for ComEd payments to ▓▓▓▓▓▓▓▓ so the addition of payments to ▓▓▓▓ would result in ▓▓▓▓ being ▓▓▓▓ third Madigan associate ("consultant") to whom he is making or directing payments at McClain's and Madigan's direction.

[77] ▓▓▓▓ was identified as the other party to this call because the phone number McClain called is subscribed to ▓▓▓▓ and the nature of the conversation, particularly in light of the other calls McClain made regarding the solicitation of payments for ▓▓▓▓, demonstrates that ▓▓▓▓ is the person with whom McClain spoke.

109

giving money to ███████ and concealing the nature and origin of the payments through the use of a consulting contract. Specifically, McClain stated, "Yeah. I got, a mutual friend of ours [Madigan] believes that since I'm retired, I have more time for assignments." ███████ stated, "Yeah, yeah. Items, items." McClain stated, "Items, yeah." Later in the conversation, McClain stated, "So, let me tell you what I was thinking." ███████ stated, "Yes." McClain stated, "Is, ah, trying to get some people to kick some money in every month. I would do up a contract." ███████ stated, "Uh huh." McClain stated, "So there'd be a consulting contract, not an employment contract." ███████ responded, "Sure." McClain stated, "Um, and it would be, you know, whatever you think is, you can come up with a month and then, uh, and, uh, then at the end of six months, this guy ███████ would write us a report that says, you know, here's, what, here's a paragraph on six House members, three Senators, you know, four Aldermen, four County Board members, so that you had a piece of paper in case –" ███████ stated, "Of course." McClain continued, "Somebody came to you and said, 'What'd the hell this guy do?' I mean, meaning the IRS." [McClain explained that ███████ would write a short report that could be shown to the IRS to make it seem ███████ was legitimately hired as a consultant.] ███████ stated, "Yeah, right." McClain stated, "That you'd have, you'd have a contract and you'd have a piece of paper, so." ███████ responded, "Yeah, yeah. And I mean at the end of the day there's a great way

to do that that can be even more hyper-focused on the city of Chicago and Cook County, which is really, you know, it's candid, it's something that I, it wouldn't hurt for me to have. You know what I mean?" McClain stated, "Uh huh." ▮▮▮▮▮stated, "So, um, I'm extremely comfortable with that." McClain stated, "Okay, okay. Alright." ▮▮▮▮▮ stated, "And it's like, I don't know what the guy wants to do. If he needs, listen, I don't know what his living situation is. I don't know how, if he wants to be sitting in an apartment somewhere, if he wants to come downtown. I don't give a fuck. Have him come to the office. You know what I mean?" McClain stated, "Sure." ▮▮▮▮▮ stated, "Um, he's not, obviously, the guy's not gonna be doing any direct lobbying and stuff so it's between us." McClain stated, "Right. Exactly. Exactly. So, what are you comfortable doing?" Later in the conversation, McClain stated, "Okay. But I'm not, I'm not looking for a huge figure. I'm looking for, like, uh, would you do a grand or two grand a month for six months?" ▮▮▮▮▮responded, "Oh shut the fu-, Mike, that's it?" McClain stated "That's it." ▮▮▮▮▮stated, "Oh, but what if we wanna get him loaded up?" McClain stated, "Well, but I'm gonna get some other guys, too. I mean . . . And if you wanna do more than that, that's fine. I just, ah, um, I just wanna help the guy get –." ▮▮▮▮▮stated, "Oh, fuck, Mike. [Unintelligible], listen. Two [$2,000] is done. Forget it." McClain stated, "Okay, okay." ▮▮▮▮▮stated, "Yeah, stop. No problem. I thought we wanted to hit him with like 10 Gs a month [$10,000 per month] somehow." McClain responded, "No, no, no." ▮▮▮▮▮ stated, "Ok." McClain said, "And, I, I'm going to get some other people, so we may get up to that, but . . ." ▮▮▮▮▮

111

stated, "Yeah." McClain stated, "I wouldn't, I wouldn't ask for that for you." ▮▮▮▮
stated, "Okay, yeah, don't kill yourself, what-, you know, whatever you need, I'm here.
Of course." McClain said, "Okay, okay." ▮▮▮▮ stated, "That's not a big deal, I
thought we were talking monster numbers." McClain stated, "No . . . I'm gonna spread
it around a little bit." ▮▮▮ said, "We're good."

109.  On or about August 28, 2018, at approximately 9:52 a.m. (Session
#12138), McClain placed an outgoing call from the McClain Phone to a telephone
number used by ▮▮▮▮▮▮▮▮ [78] During the call, McClain and ▮▮▮▮▮▮
discussed an arrangement to pay ▮▮▮ through a consulting contract that would
conceal the nature of the payments. McClain stated, "So, uh, I met with ▮▮▮▮▮▮,
who asked me if I can help find him a job, right?" As in his call to ▮▮▮▮ (described
two paragraphs above), McClain repeated that Madigan ("the Speaker") intended to
help ▮▮▮ after he is re-elected as Speaker ("[a]fter he's sworn in and gets his rules"),
but that they were awaiting the results of an investigation into ▮▮▮ alleged
misconduct and that it would be hard to find a job for ▮▮▮ pending completion of
that report. McClain then continued: "Uh, so I decided, I, I've tried to put some guys

---

[78] In addition to the subject matter of the call, ▮▮▮▮▮ was identified based upon the fact
that the receiving phone number being called is subscribed to ▮▮▮▮ McClain refers to
him as "▮▮" during the call, and McClain mentions ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

together to kick in a grand [$1,000] each, including me, uh, for six months or until he, and if he gets a job earlier than that, then it would all terminate, uh, wondered if, and my thought is, actually do a contract with him, for each person. So that uh, he would do like a report, uh, like, and say, six house members, three senators, three Aldermen, three County Board members, so at the end of the day, you and I would have a uh, not only a contract in case the IRS checked this out, but we'd also have a piece of paper, uh you know, two or three page piece of paper from, this is a report that he did. McClain further stated, "I wondered if you, you're game to be part of that." ▮▮▮▮▮▮expressed some reluctance in participating and questioned whether ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮stated, "If you talk to ▮▮▮ and ▮▮▮ and, look – this is, uh, in, in, in their world, uh this is about, uh, improving and continuing to maintain relationships, right? That's how they would see. And he would not register, correct?" ▮▮▮▮▮▮ suggested that persons in authority at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ might be willing to consider the arrangement if doing so caused Madigan to maintain a positive perception of ▮▮▮▮▮▮. ▮▮▮▮▮▮ also asked whether ▮▮▮ intended to register publicly as a lobbyist as part of the arrangement.] McClain responded, "Oh, no, no, no. This is totally a consultant. And as far as I'm concerned, except for the people that are signing on, uh, no one else even knows about it, except for our friend [Madigan]." ▮▮▮▮▮▮ stated, "I wanna be a team player, Mike, you know that." McClain responded, "Everybody, everybody knows you're a team player, so it's not a question

113

of that." ▮▮▮▮▮▮ later stated his view that, "you don't care if I sell it as, this is a continuation, this is a request, a continuation of, how we improve a relationship." McClain responded, "Right." ▮▮▮▮▮▮ stated, "Okay." McClain responded, "And, you know, I think you gotta hit hard it's a consulting contract, it's not, he's not going to float around and say, 'I represent ▮▮▮▮▮▮'" ▮▮▮▮▮▮ stated, "My hope would be he would do some actual work, because I could use some help . . . I assume you don't care if he's tasked a bit for that." McClain responded, "I'd like to keep the people who know this real small . . . [a]nd so, if they feel like they have to have a board meeting, then just kind of withdraw it, because the more people know it, it's just too easy for people to babble, you know what I mean?" ▮▮▮▮▮▮ stated, "Yeah, right, right. I agree. I agree." McClain stated, "Yeah, so, if they're gonna, if you feel like they're gonna say, uh, uh, I'm helping Mike Madigan out by hiring ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ I just would not, I just would not go there, you know what I mean?" ▮▮▮▮▮▮ responded, "Yep, yep. No I get it, I get it."

110.  During the same conversation discussed in the previous paragraph, ▮▮▮▮▮▮ and McClain discussed the possibility of ▮▮▮▮▮▮ setting up a company to make political contributions and hire "consultants." During that discussion, McClain stated, "Will, uh, at one point in time I had maybe five consultants working for me . . . And all they really ever did was give me pieces of paper." [McClain suggested that he made payments to Madigan's associates by ostensibly hiring them as "consultants" when, in fact, they only provided him with a nominal work product

114

to conceal the nature and purpose of the payments.] McClain advised, "I think you just want to be nimble enough to say, 'Of course, of course.'" ▮▮▮▮▮responded, "Right, right. Yeah, I know, that's right." McClain stated, "And he [Madigan] doesn't do it very often, but, you know, about every few years, he's got somebody that he's gotta take care of for a month or two, right?" ▮▮▮▮▮responded, "Right, right." I believe that McClain was telling ▮▮▮▮▮that, in the future, he (▮▮▮▮▮▮) had to be able to fulfill Madigan's requests to make payments to Madigan associates when asked to do so.

111.   On or about August 28, 2018, at approximately 12:00 p.m. (Session #12178), McClain placed an outgoing call from the McClain Phone to a telephone number used by ▮▮▮▮▮▮▮▮▮.[79] During the call, McClain and ▮▮▮▮ discussed an arrangement to pay ▮▮▮▮ through a consulting contract that would conceal the nature of the payments. Specifically, McClain said, "So, I, I met with ▮▮▮▮▮▮ last week and he asked if, ah, I could help him try to find a job. And, ah, I told him that I thought until ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ it's gonna be very difficult for anybody to hire him. Um, and um, that,

---

[79] ▮▮▮▮ was identified as the other party to this call because the phone number McClain called is subscribed to ▮▮▮▮ and the nature of the conversation, particularly in light of the other calls McClain made regarding the solicitation of payments for ▮▮▮▮, demonstrates that ▮▮▮▮ is the person with whom McClain spoke. Further, McClain refers to him as "▮▮▮" during the call.

ah, that I would start looking around but it'd be, it'd be, it'd be good if ▮▮▮▮
▮▮▮▮▮." McClain and ▮▮▮▮ then discussed ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. With regard to ▮▮▮▮, McClain continued, "So, so
here's what I dreamt up. Um, what I dreamt up is maybe a bunch of us will
collectively, ah, and the only person who'll know this will be our, our mutual friend
[Madigan], who will be um, ah, maybe we'll all kick in a grand if you're comfortable,
for a grand each month for six months. And then between you and me, between you
and me only, ah, Madigan said once he gets sworn in as Speaker and he gets his rules,
he's, he's gonna take care of ▮▮▮▮. So, but I couldn't, I couldn't tell ▮▮▮▮ that."
▮▮▮▮ responded, "Right. Absolutely, Mike. Whatever you want, 100% on any of that
stuff." McClain responded, "Okay." Cullen stated, "Yeah, you don't even have to . . .
you just gotta tell me. It's not even a question. You know, that's as loyal as I am on
this stuff. It's just, it's ridiculous." McClain stated, "Yep. Yep." ▮▮▮▮ responded,
"You just tell me where, when, how, all that shit and it'll be done." McClain
responded, "Ok. Alright." ▮▮▮▮ responded, "Will do. Alright?" McClain stated, "So,
▮▮▮▮ said 'Yes.' Um, ▮▮▮▮▮▮ said 'Yes.' Um, ▮▮▮▮ said 'Yes.' I gotta ▮▮▮▮
▮▮▮▮▮▮▮ (laughing). And ▮▮▮▮▮, he wants to check on something
before he says 'yes.' So, so, I, I know it's not really replacing what he was making but,
ah, it's better than, you know, a week ago." ▮▮▮▮ responded, "Exactly. I mean, ya'
know, so he gets five, six, seven thousand dollars a month coming in, ya' know, it'll

116

keep him afloat." McClain said, "Right, right." McClain then explained that ▓▓▓▓ was currently ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓.

112.   On or about August 29, 2018, at approximately 1:51 p.m. (Session #12278), McClain received an incoming call on the McClain Phone from a telephone number used by Madigan. During the call, McClain and Madigan discussed efforts to recruit third parties to make monthly payments to ▓▓▓▓▓▓▓▓. Specifically, McClain said, "So, Speaker, I put four or five people together that are willing to contribute to help a monthly thing, for the next six months like I mentioned to you for ▓▓▓▓▓▓▓." Madigan said, "Yeah, yeah." McClain said, "So I'm prepared to talk to ▓▓▓▓▓▓▓ about it, but I didn't know if you wanted to mention it to ▓▓▓▓ ▓▓▓▓▓▓ or if you want to stay out of it or . . . do you want me to talk to ▓▓▓▓? I mean, whatever you want." Madigan said, "Yeah I think I ought to stay out of it." McClain said, "Okay." Madigan said, "That's what I think." McClain said, "Okay, alright. I'll take care of it." [Madigan informed McClain that he wanted to be able to appear to have no knowledge of the payments being made to ▓▓▓▓▓▓▓ ("I think I ought to stay out of it"), and directed McClain to inform ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓, that arrangements were made to supply ▓▓▓▓▓▓ with monthly payments from the aforementioned lobbyists.]

113.   On or about August 29, 2018, at approximately 1:56 p.m. (Session #12279), McClain placed an outgoing call from the McClain Phone to a telephone

117

number used by ▓▓▓▓▓▓. During the call, McClain and ▓▓▓▓▓▓ discussed McClain's efforts to secure payments from third parties for ▓▓▓▓▓▓. Specifically, McClain said, "Uhh, ▓▓▓▓, do you want to know anything that I'm gonna propose to ▓▓▓▓ or would you like to stay in the dark on that?" ▓▓▓▓ said, "Umm, what's your thoughts, Mike?" McClain said, "Um, I mean you didn't ask me to do anything. You didn't direct me to do anything. Just a question of whether or not you'd like to know." ▓▓▓▓ said, "I'd rather stay in the dark." McClain said, "Okay, stay in the dark. Alright, I just, as a courtesy I wanted to give you that option." ▓▓▓▓ said, "I appreciate it, yeah."

114.   On or about August 30, 2018, at approximately 11:09 a.m. (Session #12339), McClain received an incoming call on the McClain Phone from a telephone number used by ▓▓▓▓▓▓.[80] During the call, McClain informed ▓▓▓▓ of the arrangement to have ▓▓▓▓ receive payments from third parties and that ▓▓▓▓ would write a single report for each of the firms as a way to disguise the purposes of the payment. Specifically, McClain said, "Hey ▓▓▓▓, um, I wanted to tell you what I'm doing and see if it's okay with you." ▓▓▓▓ said, "Okay." McClain said, "So, while, while we're looking for a job for you, um, I thought maybe I'd get a few guys together and try to give you a bridge . . . of, uh, some money." ▓▓▓▓ said, "Okay." McClain

---

[80] ▓▓▓▓ voice was identified in multiple ways. First, the phone number that McClain called was subscribed to ▓▓▓▓ wife. Second, the participant in the call self-identified as "▓▓▓▓." Third, the subject matter related to McClain's efforts to solicit lobbyists to make payments to ▓▓▓▓ and the participant thanked McClain and was appreciative of McClain's efforts.

said, "It would be a consultant contract with some, you know, like three or four or five
people. . . . Um, it's gets ya five or six grand a month that you don't have now." ▓▓▓
said, "Oh that would be great." McClain said, "And, it would be like a, you know, a
six-year, a six-month contract." ▓▓▓ said, "Okay." McClain said, "And, um, and
then uh hopefully during that six months we can, you can land somewhere. You know
what I mean?" ▓▓▓ said, "Yeah, yeah." McClain said, "Um, so, I'm making calls now
and so here's my thought, see what you think. So, here's my thought that I, I, because
I don't know if they'd if they'll write it off on their on their business or not. I just don't
know that. But, it would be a contract, written contract, where you would promise to
do some research for them." ▓▓▓ said, "Okay." McClain said, "And at the end of the
six months, you'd give them that paper. So, it would be like, I'm just making this up,
you gotta tell me the number. Three senators, uh maybe three County Board
members, and maybe four City Council members. Where you could, you could write a
paragraph or two about each one, uh, talking about maybe some, not any damaging
stuff, you know, like, a little bit about 'em. A little bit about maybe who they're closest
to. Um, so that, if uh, if they got audited, they could show the IRS agent the contract
and they could also show 'em that one or two page document." ▓▓▓ said, "Okay."
McClain said, "And then, you wouldn't provide that two page document or whatever
until at the end of the contract." ▓▓▓ said, "Okay." McClain asked, "What do you
think?" ▓▓▓ said, "Sounds great. Sounds great." McClain said, "Yeah. And, the, the,
the paperwork that I'm talking about, you can give that same document to all five or

119

six people. It's not, you don't have to . . . you don't have to do six different ones." ▨▨▨
said, "Okay. Mike, um, who would, who would, who would I be, uh, who would I be
working for? Who would be – " McClain said, "Well, technically, you'd be working for
each of them." ▨▨▨ said, "And who, and who would it be?" McClain said, "Well,
right now the guys that have said yes so far are ▨▨▨▨▨▨▨▨
▨▨▨▨ uh, Mike McClain. So —" ▨▨▨ said, "Very good. Well thank you." McClain
said, "It just gives you a bridge, you know." ▨▨▨ said, "Yeah, yeah." McClain said,
"And so, it'll probably take us . . . start September 15th and go for six months." ▨▨▨
said, "Awesome. Well, I really appreciate it. Really, really appreciate it." McClain
said, "That way you just have a little cash in your pocket." ▨▨▨ said, "Yeah."
McClain said, "And, and the uh what you have to do is like falling off a ladder. You
wouldn't have any trouble doing that so —" ▨▨▨ said, "I'll do, I'll do whatever. I'm
not above doing anything so." McClain said, "Good, is that a good number, six House,
three senators, three County Board members and three aldermen?" ▨▨▨ said,
"Yeah, yeah. Sure." McClain said, "I got to do the County Board and aldermen because
▨▨▨ does only city and county stuff. He doesn't do state stuff." ▨▨▨ said, "Okay."
McClain said, "Whereas ▨▨▨, ▨▨▨ and I, well I'm, I'm retired. . . . [laughter]
They uh they do only state stuff. So, that's why I have to do a combination." ▨▨▨
said, "Okay. Yeah, Mike. Um, I just wanted your thoughts. So, so moving forward um
you know say everything you know like we talked about, say everything comes out.
You know there's some potential where things can come out that would be helpful to

120

me. Um, you know, with uh, you know potentially ▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓ Uh, and more towards the end of October hopefully they the um ▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓" [▓▓▓ told McClain that ▓▓▓ believed an

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓[81]

115. On or about August 31, 2018, at approximately 2:18 p.m. (Session #12515) McClain received an incoming call on the McClain Phone from a telephone number used by ▓▓▓▓▓▓. During the call, McClain and ▓▓▓▓▓▓ discussed the arrangement to pay ▓▓▓▓▓▓ as a consultant. Specifically, ▓▓▓▓▓▓ said, "I was calling you about ▓▓▓▓▓▓" McClain said, "Yes." ▓▓▓▓▓▓ said, "So, uh, I don't have exactly how it's all going to happen, but we'll, we'll make it work one way or the other. He'll, and I can give him things to do, right?" [I believe ▓▓▓▓▓▓ asked McClain if ▓▓▓▓▓▓ could ask ▓▓▓▓ to perform work in exchange for the money he agreed to pay ▓▓▓▓.] McClain said, "Yeah, so, it's up to you. The way I pictured it, and was, and maybe you don't wanna do it that way, but, uh, but he would do us a report, a written report of like six House members, three senators, three County Board and three City Council members and talk about things that are little known

---

[81] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

about them. Like maybe who their sugar daddies are, or something like that, who can kind of get to them." ▇▇▇▇▇ said, "Okay." McClain said, "And then, so you'd have a contract and then you'd [unintelligible] a piece of paper. So like, if ▇▇▇▇▇ was going to deduct. Go ahead." ▇▇▇▇▇ said, "Well I was going to ask, so, so, I mean, this is, this is, very like truthful and honest. So like, I know coming up, uh, I have a situation where I'm double booked and there's a committee hearing I need to be at for a client so obviously he can't attend, but he could listen to the committee hearing online and do a report for me." McClain said, "Right." ▇▇▇▇▇ said, "And that would be a, not only would that like be a product that he could produce for me, so then it's helpful to me for the client. I mean, that would be a huge help to me." McClain said, "Yep." ▇▇▇▇▇ said, "And so, things like that, like better than like the bullshit report, though that's nice, like, if I can use him for five or six things like that, that would be awesome." McClain said, "Yeah." ▇▇▇▇▇ said, "If I could do it for the six months just, you know, just once a month just ask him to do something like that. That'd be great." McClain said, "Okay. ▇▇▇▇▇ said, "Is that okay?" McClain said, "Yeah, yeah. I was trying to find something so that there's a piece of, there's a contract and a piece of paper." ▇▇▇▇▇ said, "And I would have a contract and some honest things that he actually really helped me with. That would be, that would be great." McClain said, "Yeah, I'll just have your contract different." ▇▇▇▇▇ said, "Okay, that'd be terrific. That would be terrific." ▇▇▇▇▇ continued, "Okay, uh, so, so, uh, so ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ right

122

now. He said he gets back to DC on Tuesday and he'll do some work, but he said, based on what I told him, he said we'll do it, we just have to figure out how. So, we'll get it done." McClain said, "Okay. . . . That's good." ▓▓▓▓ said, "Alright, excited, we try to produce. We try to produce." McClain said, "Well, that's what we try to do, right?" ▓▓▓▓ said, "Yep, yep, it's important." McClain said, "So, for your knowledge, Mike [Madigan] and ▓▓▓▓ know I'm doing something, but they don't know what yet and I told them I'd give them a list of who's participating, but they don't know anything, anything beyond that, so." ▓▓▓▓ said, "Okay, okay, that's fine, that's fine. I'm not going to mention it to anybody." McClain said, "Yeah, I just gotta, I stressed with ▓▓▓. 'You gotta keep it quiet.'" ▓▓▓▓ said, "No, that's right, that's right. Absolutely right. Absolutely right."

116.   During the course of the investigation, the government obtained from ▓▓▓▓ wife (who is engaged in very contentious divorce proceedings with ▓▓▓) partial records for a bank account for which ▓▓▓ is the accountholder.[82] Those records reflect the following checks, all of which were made payable to ▓▓▓ personally, were deposited into the account:[83]

---

[82] ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

[83] I know based on my training and experience that the processing of deposited checks by financial institutions often involves an interstate wire transmission for the purpose of clearing the check. Accordingly, there is reasonable cause to believe that the checks made to ▓▓▓ that were deposited into his account caused an interstate wire transmission in furtherance of the illegal activity.

| Check Date | Payor | Amount | Memo Line |
|---|---|---|---|
| 09/29/18 | ██████████████ | $1,000 | |
| 12/12/18 | ████████ | $1,000 | |
| 01/01/19 | ██████████████ | $2,000 | Consulting Services Dec 2018 |
| 01/01/19 | ██████████████ | $1,000 | Jan 2019 |
| 01/02/19 | █████████████ | $1,000 | December 2018 Services |
| 01/04/19[84] | Michael F. McClain and ████████ | $1,000 | |
| 01/22/2019 | ██████████████ | $1,000 | January 2019 Services |
| 02/04/2019 | ██████████████ | $1,000 | Jan 2019 |
| 03/01/19 | ██████████████ | $1,000 | March 2019 |

---

[84] The handwritten date on the check is January 4, 2018. I believe that this was an unintentional error for two reasons. First, the check was deposited on or about January 8, 2019. Second, the evidence summarized above indicates that this stream of payments to ████ was did not come to fruition until in or about late August 2018, at the earliest. This check was signed by ████████████████████████

124

**D.    Probable Cause Exists to Search the Subject Premises.**

117.   As a result of my law enforcement experience, the evidence gathered during this investigation, and my discussions with fellow law enforcement agents, I am familiar with the means and methods of those who engage in public corruption and fraud offenses, such as the **Subject Offenses**. Among other things, I know that those engaged in the **Subject Offenses** typically:

      a.    Maintain books, records, emails, notes, receipts, ledgers and other papers in electronic and paper format relating to expenses and expenditures related to their fraud and corruption schemes, as well as other documents related to the obtaining, transferring secreting, or sending money or other items of value associated with their illegal activities.

      b.    Maintain books, papers, calendars, notes, schedules, cellular telephones, electronic address books in electronic and paper format, the contents of which reflect the names, addresses, and/or telephone numbers of their associates in illegal activities.

      c.    Maintain documents in electronic and paper format regarding work duties and activities, including correspondence, handwritten notes, emails, calendars, appointments books, meeting logs and records pertaining to meetings and/or phone calls.

      d.    Maintain the aforementioned books, papers, documents, electronic records and other items in their homes and in their offices, on their

125

home computers, and on their phones, so they have ready access to such information.

118.   I also know, based upon my experience and training, that individuals generally maintain their personal financial and tax records in a secure location, most often in their personal residence, including in immediately accessible areas that are secure, such as an attached or detached garage. Further, based upon my experience and training, I know that individuals who operate small businesses out of their homes also often maintain their personal and business financial and tax records in a secure location, most often in their personal residence, including in immediately accessible areas that are secure, such as an attached or detached garage.

119.   An ISOS driver's registration database (last visited on May 10, 2019) identifies the **Subject Premises** as the residence of McClain ███████ [85]

120.   Further, the $1,000 check written to ████ by McClain ███████, as described above, identifies the **Subject Premises** as the address for McClain ███████ ███.

121.   The evidence gathered to date establishes probable cause to believe that McClain operates his consulting business out of the **Subject Premises**. In particular, Marquez provided agents with a copy of McClain's consulting contract with ComEd for calendar year 2019, which, according to Marquez, was fully executed

---

[85] McClain also owns a condominium in Chicago, Illinois.

by the parties.[86] That contract provides that McClain will be paid $180,000 during calendar year 2019 for consulting services. The contract is between ComEd (as represented by Exelon Business Services Co.) and Michael F. McClain, although the signature block for McClain reference "Michael McClain Consulting," which is also the entity to which any formal notices under the contract are to be given. In the contract, the **Subject Premises** is listed as the address for both McClain and Michael McClain Consulting. A search of the ISOS corporation databased (visited on May 10, 2019) does not result in the identification of any registered business entity by the name "Michael McClain Consulting." This suggests that McClain's consulting business is a sole proprietorship that he operates from the **Subject Premises**.

122.   As detailed above, McClain has used the McClain Phone to engage in all of the **Subject Offenses**, including conversations regarding (a) Madigan's request that ▓▓▓▓▓▓ be appointed to the ComEd Board of Directors; (b) Madigan's solicitation of ComEd/Exelon to continue making payments, through the Intermediaries, to various Madigan associates, including ▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓; and (c) the solicitation of multiple registered lobbyists (including ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓) to make payments to Madigan associate ▓▓▓▓▓▓. During these calls, McClain has expressed his awareness of the illegal nature of the payment arrangements and his desire to conceal those arrangements in

---

[86] The copy of the consulting agreement provided to the government by Marquez does not bear McClain's signature, although it indicates that it was executed on January 2, 2019.

127

various ways, including by limiting the number of people aware of the arrangements, the use of the Intermediaries to funnel payments from ComEd so that they appear to merely be consulting or lobbying fees charged by the Intermediaries, and, as in the solicitation of payments for ██████ through the creation of false documents designed to defeat an IRS tax audit into the source, purpose and nature of the payments.

123.   The items to be seized at the **Subject Premises** (see Attachment B) will be limited to the time period of February 2012 to the present. This limitation is based upon the evidence, discussed above, indicating that the illegal payments through JDDA originated during the period that ████████████████████████ and were in place when Anne Pramaggiore became the CEO of ComEd, which, as discussed above, occurred in or around February 2012 (see paragraph 15).

124.   The evidence gathered to date, particularly the ████████████ ████████████, demonstrate that McClain maintains possession of the McClain Phone and uses it frequently throughout the day. Thus, if McClain is inside the **Subject Premises** at the time the search warrant is executed, it is likely that the McClain Phone will also be within the **Subject Premises**. As also discussed above, McClain has made reference to transmitting email and text messages, both of which could be transmitted conveniently using the McClain Phone.

125.   Based upon my training and experience, I know that cellular phones may contain relevant evidence of the **Subject Offenses**, including text messages that are located in the memory of such phones. Such data may provide information

128

regarding the identities of, and the methods and means of operation and communication used by, the participants in the **Subject Offenses**, as well as the identity of individuals with knowledge of facts relevant to the **Subject Offenses**. Moreover, digital photographs stored in such phones may contain images of the user of such phones, the user's associates (including persons involved in, or who have relevant knowledgeable concerning, the **Subject Offenses**), places frequented by the user of the particular phone leading up to and during the **Subject Offenses**, and locations and instrumentalities used in committing the **Subject Offenses**.

126. In addition, based on my training and experience, I know that information stored within a cellular phone may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored within a cell phone can indicate who has used or controlled the cell phone. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, contacts lists, instant messaging logs, and communications (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the cell phone at a relevant time. Further, such stored electronic data can show how and when the cell phone and its related account were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cell phone access, use,

129

and events relating to the crimes under investigation. This "timeline" information may tend to either inculpate or exculpate the cell phone account owner.

127.   Additionally, information stored within a cell phone may indicate the geographic location of the cell phone and user at a particular time (*e.g.*, location integrated into an image or video sent via email or text message to include both metadata and the physical location displayed in an image or video). Stored electronic data may also provide relevant insight into the cell phone owner's state of mind as it relates to the offense under investigation. For example, information in the cell phone may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement). Unless this data is destroyed, by breaking the cell phone itself or by a program that deletes or over-writes the data contained within the cell phone, such data will remain stored within the cell phone indefinitely.

128.   Based on my experience and the experience of other law enforcement agents, I know that individuals involved in criminal offenses commonly use cellular telephones as a means to communicate. Indeed, the evidence described herein demonstrates that McClain, Pramaggiore and Hooker have each regularly used their respective cellular phones for an extended period of time to discuss and facilitate the **Subject Offenses.** Individuals involved in criminal offenses also often store telephone numbers and names or nicknames of fellow conspirators on their

130

telephones and the telephones also reflect recent call history. Finally, individuals often use text messaging and digital photographs in furtherance of their criminal activity that are stored on cellular telephones. Items like text messages can be stored for extended and indefinite periods of time unless the user of the telephone affirmatively deletes these communications.

## III.  SPECIFICS REGARDING SEARCHES OF ELECTRONIC STORAGE MEDIA

129.  Based upon my training and experience, and the training and experience of specially trained personnel whom I have consulted, searches of evidence from electronic storage media commonly require agents to download or copy information from the electronic storage media and their components, or remove most or all electronic storage media items (*e.g.* computer hardware, computer software, computer-related documentation, and cellular telephones) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.  Electronic storage media can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he or she often stores it with deceptive file names. This requires searching authorities to examine all the stored data to determine whether it is included in the warrant. This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

131

b.      Searching electronic storage media for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data. The search of an electronic storage media system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files. Since electronic storage media evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

130.   In order to fully retrieve data from a computer system, the analyst needs all storage media as well as the computer. The analyst needs all the system software (operating systems or interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard disk drives or on external media).

131.   In addition, electronic storage media such as a computer, its storage devices, peripherals, and Internet connection interface may be instrumentalities of the crime(s) and are subject to seizure as such if they contain contraband or were used to carry out criminal activity.

132

132.   I know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple brand devices offer their users the ability to unlock the device via the use of a fingerprint or thumbprint (collectively, "fingerprint") in lieu of a numeric or alphanumeric passcode or password. This feature is called Touch ID.

133.   At this time, it is known that the McClain Phone is an Apple brand device, specifically an Apple iPhone 8. According to publicly available information, the Touch ID is an available feature on the iPhone 6S, 7 and 8. Therefore, the Touch ID feature is an available feature on the McClain Phone.

134.   If a user enables Touch ID on a given Apple device, he or she can register up to five fingerprints, either their own or those of another individual, that can be used to unlock that device. The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) found at the bottom center of the front of the device

135.   In my training and experience, users of Apple devices that offer Touch ID often enable it because it is considered to be a more convenient way to unlock the device than by entering a numeric or alphanumeric passcode or password, as well as a more secure way to protect the device's contents. This is particularly true when the user(s) of the device are engaged in criminal activities and thus have a heightened concern about securing the contents of the device.

133

136.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode or password must be used instead. These circumstances include when more than 48 hours have passed since the last time the device was unlocked. The Touch ID feature will also not work and entry of a passcode will be required if the device's user or someone acting on the user's behalf has remotely locked the device. Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID, and execute the search authorized by the requested warrant, exists only for a short time (*i.e.*, 48 hours or less, or until the device is given a remote lock command). Touch ID also will not work to unlock the device if the device has been turned off or restarted (*e.g.*, if the device's battery becomes fully depleted), or after five unsuccessful attempts to unlock the device via Touch ID are made. In addition, I also know from my training and experience, as well as from information found in publicly available materials including those published by Apple, that some models of Apple devices, such as iPhones and iPads, offers users the ability to remotely erase the contents of such devices.

137.  The passcode or password that would unlock the McClain Phone is unknown. Thus, if the McClain Phone is located within the **Subject Premises**, it likely will be necessary to press the finger(s) of McClain to the McClain Phone's Touch ID sensor in an attempt to unlock the device for purpose of executing the search authorized by this warrant. Attempting to unlock the relevant Apple devices via

134

Touch ID with the use of the fingerprints of the user(s) is necessary because the government may not otherwise be able to access or retrieve the data contained on those devices for the purpose of executing the search authorized by the requested warrant.

138.   Although I do not know which of McClain's 10 fingerprints is capable of unlocking the McClain Phone, based on my training and experience, I know that it is common for a user to unlock a Touch ID-enabled Apple device via the fingerprints on thumbs or index fingers. In the event that law enforcement is unable to unlock the McClain Phone within the five attempts permitted by Touch ID, this will simply result in the device requiring the entry of a password or passcode before it can be unlocked.

139.   Due to the foregoing, I request that, if the McClain Phone is located within the **Subject Premises**, the Court authorize law enforcement to press the fingers (including thumbs) of McClain to the Touch ID sensors of the McClain Phone for the purpose of attempting to unlock the device via Touch ID in order to search the contents as authorized by the requested warrant.

## IV.   CONCLUSION

Based on the above information, I respectfully submit that there is probable cause to believe that the **Subject Offenses** have been committed, and that evidence and instrumentalities relating to this criminal conduct, as further described in Attachment B, will be found in the **Subject Premises**, as further described in Attachment A. I therefore respectfully request that this Court issue a search warrant

135

for the **Subject Premises**, more particularly described in Attachment A, authorizing

the seizure of the items described in Attachment B to the search warrant.

FURTHER AFFIANT SAYETH NOT.


Edward W. McNamara
Special Agent
Federal Bureau of Investigation


Subscribed and sworn
before me this 13th day of May, 2019


Honorable Tom Schanzle-Haskins
United States Magistrate Judge


136

## ATTACHMENT A

## DESCRIPTION OF PREMISES TO BE SEARCHED

The premises to be searched consists of the single family residence located at ███████████, Quincy, Illinois. Photographs of the front of the residence appear below:





The words "███████████" appear on the square, stone-faced pillar pictured at the base of the driveway in the photograph above.

1

The premises is accessible through a door that is located at the front of the premises. A photograph of that front door entrance appears below:



The premises also includes an attached multi-car garage accessible by a driveway. A photograph of the driveway and the attached garage doors appears below:



2

**ATTACHMENT B**

**LIST OF ITEMS TO BE SEIZED**

Evidence and instrumentalities concerning violations of Title 18, United States Code, Sections 371, 666, 1343, 1349, 1951 and 1952, but excluding any privileged materials, as follows:

For the period of February 2012 to the present, all of the following:

1. Any and all records and communications with or concerning Michael Madigan and/or any individuals who act on his behalf or at his direction.

2. Any and all records related to communication with members of the Board of Directors, officers, employees, consultants, contractors, lobbyists, and agents or representatives of Exelon Corporation ("Exelon") and/or Commonwealth Edison Company ("ComEd"), as well as their subsidiaries and affiliated business entities, including, but not limited to, ███████████ Anne Pramaggiore, John T. Hooker, ███████ ████████████████ Fidel Marquez, Jr., and ██████████████.

3. Any and all records related to the provision by Michael F. McClain of consulting, lobbying or other services to Exelon or ComEd, including, but not limited to, information and communications related to financial compensation for any such services.

4. Any and all records related to Exelon's and ComEd's strategy, intent or position with respect to proposed or pending legislation in the State of Illinois.

5. Any and all records relating to, and communications with, members of the Illinois General Assembly, past or current, concerning the business or affairs of Exelon and ComEd, as well as their subsidiaries and affiliated business entities.

6. Any and all records related to the appointment of ███████████ to the ComEd Board of Directors, including, but not limited to, information and communications related to options to the appointment of ███████ ██████ as well as any impact (*e.g.,* financial, legislative, political or

3

otherwise) that might result from a failure to appoint ███████ to the ComEd Board of Directors.

7.   Any and all records related to Jay D. Doherty, ██████████████████ ███████, as well as the employees, officers or agents of Jay D. Doherty & Associates, Incorporated ("JDDA"), ████████████████████████████ ███████████████.

8.   Any and all records related to the provision of payments made by Exelon or ComEd to individuals or businesses (including, but not limited to, ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████) by or through any third party serving as an intermediary, including, but not limited to, Michael F. McClain; ████████████████████████████; Jay D. Doherty; JDDA; ████████████ ████████████████████████████████████████████████████████████ █████████████████.

9.   Any and all records related to ████████████████████████████ ██████████████████████████.

10.  Any and all records related to payments made to ███████████ by the following individuals and entities: ███████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ █████████████████.

11.  Any and all records related to communications with ███████████████ related to, or concerning, the hiring or payment of individuals at the direction of Michael McClain or Michael Madigan.

12.  Any and all records related to, or communications with, the Board of Directors, officers, employees, consultants, contractors, lobbyists, and agents or representatives of ███████████, as well as their subsidiaries and affiliated business entities.

13.  Any and all records related to the provision of payments made by ███████████ to individuals or businesses, either directly or through a third party serving as an intermediary.

14.  Any and all information and communications relating to work history, work location, planning and scheduling.

4

15.   Proof of ownership and occupancy of the Subject Premises.

16.   Any computers and electronic storage media that contain or may contain
any of the items listed above, which shall be searched in accordance with
the attached Addendum to Attachment B.